

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES F. BENDA, JR., | ) |
| Plaintiff, | ) ) ) |
| | ) No. 04 C 0952 |
| v. | ) ) |
| PER-SE TECHNOLOGIES, INC., | ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Charles F. Benda, Jr. ("Benda") sues Defendant Per-Se Technologies, Inc. ("Per-Se") for fraudulent inducement and tortious interference with a business expectancy. Per-Se moves for summary judgment on all counts. For the reasons discussed below, the Court grants in part and denies in part Per-Se's motion.

## BACKGROUND

### I.  Parties And Relevant Non-Parties

Benda resides in St. Charles, Illinois. (R. 36-1; Pl.'s Resp. to Def.'s Stmt. Mat. Facts ("Def.'s SMF") ¶ 1.) From April 2003 to January 2004, Per-Se employed Benda as its National Vice President of Per-Se's Academic and Multi-Specialty Practice Group ("AMSG"). Per-Se is a Delaware corporation with its principal place of business in Atlanta, Georgia. (*Id.*) Per-Se provides medical billing and collection services to hospitals, physician groups, and individual physicians. (*Id.* ¶ 3.)

Douglas Marcotte ("Marcotte") was the Senior Vice President of Sales and Marketing at Per-Se during all relevant times. Frank Murphy ("Murphy") was the President of Per-Se's Physician Services Division at all relevant times.

## II. Per-Se's Business

The Physician Services Division of Per-Se enters into "service agreements" to outsource the billing and collection functions of various health-care organizations, and then Per-Se earns a percentage of the funds collected on behalf of clients. (*Id.* ¶ 4.) Per-Se divides the Physician Services Division into the following five separate sales groups: (1) Anesthesiology, (2) Radiology, (3) Pathology, (4) Emergency Room, and (5) Academic and Multi-Specialty Practice. (*Id.* ¶ 5.) Per-Se commonly refers to these groups as "verticals." (*Id.* ¶ 6.) The Physician Services Division also includes operational groups, such as the Account Management Group. (*Id.* ¶ 7.) Once a client executes a service agreement, the Account Management Group works directly with the client to implement Per-Se's systems and to ensure proper operation. (*Id.* ¶ 8.)

The AMSG targets two distinct markets – (1) physician practices affiliated with academic institutions (commonly called the "academic" market), and (2) multi-specialty physician practices (commonly called the "multi-specialty" market). (*Id.* ¶ 9.) Traditionally, the AMSG focused exclusively on the academic market as opposed to the multi-specialty market. (*Id.* ¶ 11.)

The primary tool used to track sales prospects at Per-Se is the Baseline, Upside, and Commit ("BUC") Report." (*Id.* ¶¶ 17, 18.) The BUC Report categorizes sales leads based in part on the likelihood of making a sale. (*Id.* ¶ 19.) Per-Se lists a lead as "Upside" if it has approximately a 50% chance to close. (*Id.* ¶ 20.) It lists a lead as "Commit" if a service agreement is close to being signed and the sale has a 75% chance of closing. (*Id.* ¶ 21.) Finally, Per-Se lists a lead as "Baseline" once it closes the lead, and the service agreement is ready for it to implement. (*Id.* ¶ 22.) The sales directors maintain responsibility for initially listing sales prospects on the BUC Report. (*Id.* ¶ 23.)

2

## III. Benda's Employment With Springfield

Prior to joining Per-Se, Benda worked for Springfield Service Corporation ("Springfield") as the Senior Vice President for Sales and Marketing. (*Id.* ¶ 26.) While at Springfield, Benda worked closely with Diane Derus. (*Id.* ¶ 27.) Benda and Derus have worked together for over fifteen years. (*Id.*)

According to Benda, Springfield's primary financial backer was the Bank of Bahrain. (*Id.* ¶ 29.) Benda assumed that due to "geopolitical" issues affecting the Middle East, the Bank of Bahrain was considering divesting itself of its interest in Springfield. (*Id.* ¶ 30.) His perceived uncertainty over the future owners of Springfield concerned Benda. (*Id.* ¶ 31.) Benda personally attended numerous meetings where employees discussed Springfield's financial situation, and he even participated in attempting to secure alternative financing for Springfield. (*Id.* ¶ 32.) Benda considered leaving Springfield beginning in early 2003. (*Id.* ¶ 35.)

## IV. Benda's Employment With Per-Se

Benda met with Marcotte on two occasions and Murphy on one occasion to discuss potentially working for Per-Se. (*Id.* ¶ 36.) In April 2003, Per-Se hired Benda as the National Vice President of AMSG. (*Id.* ¶ 37.) Benda was an at will employee throughout his employment with Per-Se. (*Id.* ¶ 38.) At the time Per-Se hired him, Benda's annual base salary was $155,000 plus advanced commissions in the amount of $15,000 paid over six months. (*Id.* ¶ 40.) The compensation plan applicable to Benda was entitled the 2003 Sales Compensation Plan-National Vice Presidents ("2003 Compensation Plan"). (*Id.* ¶ 41.) The amount of Benda's commissions depended on the extent to which the AMSG met its quota. (*Id.* ¶ 42.) On sales that represented between 0% and 80% of the sales quota, the 2003 Compensation Plan called for Plaintiff to earn ½ of a percent on the sales generated by AMSG. (*Id.* ¶ 43.) The 2003

3

Compensation Plan specified that an employee would earn commissions on sales that closed during the "Plan Year," which was the calendar year 2003. (*Id.* ¶ 44.) The 2003 Compensation Plan also provided that, in order to receive any commissions, Benda must (1) sign an acknowledgement defining the 2003 Compensation Plan; (2) sign Per-Se's standard non-disclosure contract; and (3) complete training on Per-Se's standards of conduct. (*Id.* ¶ 45.) Benda did not sign an acknowledgement defining the 2003 Commission's Plan. (*Id.* ¶ 46.)

As National Vice President for AMSG, Benda served as a sales manager. (*Id.* ¶ 49.) Benda's responsibilities included ensuring that AMSG was closing sales for services agreements. (*Id.* ¶ 50.) In 2003, the annual sales quota for AMSG was $11 million, which translated into a quarterly quota of $2.75 million. (*Id.* ¶ 51.) Benda understood that because he began working on April 1, 2003, Per-Se adjusted his quota to 75% of the 2003 AMSG team total, or $8.25 million. (*Id.*)

The AMSG did not meet its sales quota for 2003. (*Id.* ¶ 68.) The AMSG missed its sales quota for each of the three quarters during which Benda worked. (*Id.* ¶ 69.) In the fourth quarter of 2003, the AMSG did not close $2 million in sales, but instead closed approximately $700,000. (*Id.* ¶ 70.)

## V.   Per-Se's MedAxxis Software

MedAxxis is a practice management system sold by Per-Se. (R. 46-1; Def.'s Reply to Pl.'s Stmt. Add. Mat. Facts ("Pl.'s SAMF") ¶¶ 18-19.) Benda contends that both Marcotte and Murphy represented to him that MedAxxis was "state of the art" and "fully functional" and was in use at many large multi-specialty practices throughout the country. (*Id.* ¶¶ 20, 25.) Benda contends that because of MedAxxis's deficiencies, he proceeded with a back-up solution, the Electronic Healthcare System ("EHS"). (*Id.* ¶ 35.) EHS develops, installs, and supports practice

4

management systems throughout the country. (*Id.* ¶ 36.) Benda also asserts that he reorganized Per-Se's sales force in order to address MedAxxis's deficiencies. (*Id.* ¶ 39.)

## VI. The University of Texas-Houston Deal

Around the time that Per-Se hired Benda, Per-Se began negotiating a deal with the University of Texas-Houston ("UT-Houston"). (R. 36-1; Def.'s SMF ¶ 82.) The deal began as a potential services agreement for the UT-Houston Anesthesiology Department. (*Id.* ¶ 83.) At some point in the deal, Per-Se gave responsibility for overseeing the deal to David Mason, the Senior Vice President for Account Management. (*Id.* ¶ 86.) While the parties dispute Benda's level of involvement in the UT-Houston deal, they agree that Benda only made two trips to Houston in connection with the deal and his last trip was in September 2003 – four months before the deal closed. (*Id.* ¶ 89.) Toward the end of 2003, UT-Houston announced that it had selected another vendor for billing and collection services. (*Id.* ¶ 91.) Per-Se, however, ultimately closed the UT-Houston deal because of significant financial guarantees offered by Per-Se. (*Id.* ¶ 92.) The deal closed in early 2004, after Per-Se terminated Benda. (*Id.* ¶ 90.)

## ANALYSIS

## I. Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court considers the evidentiary record in a light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).[1]

## II. Benda's Fraudulent Inducement Claim

### A. Whether Benda Waived His Fraudulent Inducement Claim

Per-Se argues that Benda waived his fraudulent inducement claim by continuing his employment for nine months after discovering the alleged fraud. Under Illinois law:

> [a] person who has been misled by fraud or misrepresentation is required, as soon as he learns the truth, to disaffirm or abandon the transaction with all reasonable diligence, so as to afford both parties an opportunity to be restored to their original position. If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of relief from the misrepresentations.

*Eisenberg v. Goldstein*, 29 Ill.2d 617, 622, 195 N.E.2d 184, 186-87 (Ill. 1963). This waiver rule prevents a plaintiff from "lying back and speculating as to whether avoidance or affirmance of a contract will ultimately prove more profitable." *Lillien v. Peak6 Investments, L.P.*, No. 03 C 2292, 2004 WL 1445231, at *5 (N.D. Ill. June 24, 2004) (internal citations omitted). Waiver is

---

[1] Neither party properly followed Northern District of Illinois Local Rule 56.1. Rule 56.1 requires that within each short numbered paragraph, the party must refer to the "affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." Statements and responses that do not properly cite to the record are subject to the Court's discretion as to their admission. *See Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997). Here, neither party cited to the record in their statement of material facts and therefore did not properly follow Rule 56.1. Further, within their legal memoranda, the parties did not cite to the statement of material facts (presumably because the statements of material facts, themselves, did not reference the record). *See Malec v. Sanford*, 191 F.R.D. 581, 586 (N.D.Ill. 2000). Benda's failure to follow the proper procedure is especially egregious because Benda does not entirely set forth his version of the facts within his legal memoranda, rather relying on his statement of material facts. *Malec*, 191 F.R.D. at 585. As this case proceeds, the Court reminds the parties to closely follow all applicable rules in submitting documents to the Court.

generally an issue of fact for the trier of fact to determine after considering all information and circumstances. *Resolution Trust Corp. v. State Bank of Woodstock*, No. 90 C 1748, 1992 WL 13007, at *5 (N.D. Ill. Jan. 24, 1992) (citing *Lee v. Heights Bank*, 446 N.E.2d 248, 254 (Ill.App. 1983); *Ainsworth Corp. v. Cenco, Inc.*, 437 N.E.2d 817, 822 (Ill.App.1982)).

Benda points to his declaration where he states that upon learning that the MedAxxis software was deficient he expressed his concerns to Per-Se executives and pursued the EHS as a back-up solution. (R. 44-1; Benda Decl. ¶¶ 34-36.) Benda also states that he reorganized the sales force in order to address MedAxxis's deficiencies. (*Id.* ¶ 39.) As sales continued to suffer, Benda states that he further urged Per-Se to make the EHS product available to his sales team as soon as possible. (*Id.* at ¶ 45.) This evidence creates a triable issue of fact whether Benda waived his claim for fraudulent inducement.

Per-Se argues that Benda's "remedial" steps are insufficient under Illinois law requiring Benda to "disaffirm or abandon" his employment. Under Per-Se's interpretation, Illinois law required Benda to terminate his employment as soon as he learned of the MedAxxis deficiencies. The Court does not interpret Illinois law to be so harsh. In analyzing whether the plaintiffs waived their fraud claim in *Eisenberg v. Goldstein*, the Illinois Supreme Court looked to when the plaintiffs first complained of the fraud, not merely whether the plaintiffs abandoned the transaction. 195 N.E.2d at 186 (finding that the "plaintiffs failed to promptly complain of the alleged misrepresentation upon discovery of the [fraud].") Further, the fraudulent transaction in *Eisenberg* was a real estate transaction where, as here, the transaction at issue is employment.[2]

---

[2]Per-Se points to *Lillien v. Peak6 Investments*, 2004 WL 1445231, (N.D. Ill. June 24, 2004) and *Payne v. AHFI/Neterlands, B.V.*, 522 F.Supp. 18, 24-25 (N.D. Ill. 1980), as cases where district courts granted summary judgment on the issue of waiver in fraudulent inducement employment cases. These district court cases do not bind the Court. Further, in *Lillien*, the court looked to whether the plaintiff objected to the fraud, along with whether or not the plaintiff looked for a new job. Therefore, even *Lillien* implies that a plaintiff may be able to avoid waiving his fraud

7

In most circumstances, terminating a job is a more onerous task than rescinding a real estate or commercial transaction. *See Havoco v. Am., Ltd. v. Hilco, Inc.*, 731 F.2d 1282, 1291 (7th Cir. 1984) (denying summary judgment on issue of waiver of fraud claim, distinguishing *Eisenberg* because in *Eisenberg* the transaction was one that was relatively easy to disaffirm). It also may be understandable why a new employee may hesitate to sue his new employer for fraud, without first attempting to remedy the situation. All of these issues are questions of fact for the trier of fact to decide.

### B. Whether Plaintiff Can Meet The Elements Of His Fraudulent Inducement Claim

In order to establish a fraudulent inducement claim under Illinois law, a party must demonstrate by clear and convincing evidence: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1341 (7th Cir. 1992).

#### 1. Whether Benda Has Conceded That Certain Statements Were True

Benda's Complaint sets forth four allegedly false statements: (1) "the near-term sales prospects (closure within three months), as represented on a sales pipeline (BUC Report), totaled over $14,650,000 in aggregate, represented by over 28 prospective clients;" (2) "the practice management system software known as MedAxxis, required for office-based multi-specialty group practices, which was Plaintiff's target market, possessed the requisite product functionality deemed adequate to provide Per-Se with a competitive advantage in the marketplace;" (3) "in his position as National Vice President, Academic and Multi-Specialty

---

claim by taking remedial action short of terminating his employment.

Groups, Plaintiff was to be given the control necessary to influence a positive outcome related to his professional responsibilities;" and (4) "the sales prospects would result in substantial commissions... in excess of $250,000." (R. 1-3; Compl. ¶ 7.) In his briefing, Benda also asserts that Per-Se made false statements related to a $7 million sale to UMDNJ. (R. 37-1; Pl.'s Opp. Br. at 8.) Per-Se argues that Benda has conceded that, with the exception of the statement about the functionality of the MedAxxis software, all of these statements were true.

### a. Statements Related To The BUC Report

Per-Se first contends that Benda admitted at his deposition that statements that the sales prospects listed on the BUC Report totaled over $14 million in potential sales from 28 different prospects were true. While Benda concedes that Marcotte and Murphy relied on the BUC Report (R. 29 - 4; Ex. 3 at 207:4-7; 209:13-210:1), he plainly asserts that the BUC Report itself was inaccurate (*Id.* at 207:12-208:22). Benda, therefore, has not conceded that these statements related to the BUC Report were true.

### b. Statements Related To Benda's Control

Per-Se also argues that Benda conceded that statements related to the amount of control that Per-Se would give to him were true. At his deposition, Benda admitted that he does not believe that statements made to him about his control at Per-Se were false. (*Id.* at 225:17-22.) Rather, Benda concedes that he and Per-Se merely had a difference of opinion regarding these statements. (*Id.* at 225:23-226:8.) Benda does not contest in his response brief that these admissions rule out any claim for fraud based on Per-Se's statements regarding Benda's control. Accordingly, the Court grants summary judgment on Benda's fraudulent inducement claim regarding statements related to the amount of control that Per-Se would give Benda.

### c. Statements Related to Benda's Commissions

Per-Se further argues that Benda admitted to the truth of statements related to the commissions that Per-Se would pay him. While Benda concedes that Per-Se paid him commissions pursuant to the 2003 plan (*Id.* at 228:20-22), he points out that he based his expectations of substantial commissions on the allegedly false sales figures in the BUC Report (*Id.* at 227:13-228:5). Therefore, to the extent the statements related to Benda's commissions tied the amount of those commissions to the false BUC Report, issues of fact exist whether those statements were also false.

### d. Statements Related To The UMDNJ Sale

In his opposition brief, Benda points out that Per-Se also made false statements regarding a $7 million sale to UMDNJ. Per-Se does not argue whether this statement was true. Rather, Per-Se argues that Benda has no evidence that Marcotte knew the statement was false at the time he made it. The Court addresses this argument in Section II.B.2.c below.

### 2. Whether Marcotte Or Murphy Knowingly Made Any False Statement Of Material Fact

Per-Se argues that even if Marcotte and Murphy made the alleged false statements to Benda, that they did not know that those statements were false at the time they made them. The Court addresses each category of the allegedly false statements in turn.

### a. Statements Related To MedAxxis

Benda contends that Marcotte and Murphy knew that MedAxxis was deficient at the time they told Benda that the product was adequate to provide Per-Se a competitive advantage in the marketplace. In support, Benda points to Marcotte's deposition testimony, admitting that shortly after he began his employment at Per-Se he became aware that MedAxxis did not deliver the necessary functionality. (R. 29-4; Ex. E at 59:14-22.) Marcotte testified that when he became

10

employed by Per-Se in 2002, he knew that MedAxxis could not offer the front-end system that large practices would require. (*Id.* at 60:8-17.) Further, Marcotte testified that he attended weekly staff meetings where Per-Se employees discussed MedAxxis's deficiencies. (*Id.* at 61:1-13.) With respect to Murphy, Marcotte said that he learned about MedAxxis in part from Murphy's direct reports at the weekly staff meetings. (*Id.* at 27:15-28:17.)

Benda also points to the deposition testimony of Derus, that she believed that prior to her employment with Per-Se, a list of MedAxxis's deficiencies existed.[3] (*Id.* at Ex. D at 50:5-53:9.) Both Benda and Derus believed that Marcotte and Murphy would have known about MedAxxis's deficiencies based on their management positions at Per-Se.

Taken in its entirety, this evidence creates a genuine issue of fact whether Per-Se knew that the statements made to Benda regarding MedAxxis's functionality were false.[4]

### b. Statements Related To The BUC Report

In arguing that Marcotte and Murphy knew that the BUC Report was inaccurate when they made statements regarding that report to him, Benda first points to the fact that they did not disagree with Benda's subsequent assessment of the BUC Report and lowered Per-Se's BUC Report figures considerably. This evidence, however, does not demonstrate that Marcotte and Murphy knew that the BUC Report was inaccurate at the time they made statements to Benda about that report *prior* to Benda's employment.

---

[3] Derus and Benda began work at Per-Se on the same day, April 1, 2003. (*Id.*, Ex. D at 50:8-10.)

[4] Per-Se points to the deposition testimony of Benda that his only evidence that Marcotte and Murphy knew of the falsity of their statements about MedAxxis when they made those statements is Benda's personal belief that they should have known those statements to be false. (*Id.*, Ex. C. 295:1-298:8.) Benda's attorneys, however, did submit additional evidence of such knowledge, mostly from the Marcotte deposition. Given the fact that the Marcotte deposition took place after Benda's deposition, it is understandable that Benda was not aware of the additional evidence when Per-Se deposed him.

11

Benda next argues that Marcotte and Murphy should have known of the inaccuracies in the BUC Report. Under Illinois law, however, negligence does not translate into fraudulent intent. *Brazell v. First Nat. Bank and Trust Co.*, 982 F.2d 206, 208-9 (7th Cir. 1992). *See also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.*, 9 F.3d 561, 572 (7th Cir.1993) (holding that plaintiff failed to establish that defendant made statements with knowledge of their falsity because at most the evidence suggested that defendant was negligent or grossly negligent). Therefore, without any additional evidence that Marcotte and Murphy knew their statements related to the BUC Report were false, Benda's assertion that they should have known that they were false is insufficient to clearly and convincingly prove such knowledge. Accordingly, the Court grants summary judgment on Benda's fraudulent inducement claims based on the statements related to figures in the BUC Report.[5]

### c. Statements Related To The UMDNJ Sale

Benda points to his own testimony that Marcotte worked on the UMDNJ deal and therefore should have known that there was no way it was going to close. (R. 29-4; Ex. C at 213:15-214:14.) Benda does not point to any other evidence demonstrating that Marcotte actually knew that statements related to the UMDNJ sale were false. Benda's belief that Marcotte should have known of the falsity of this statement is insufficient under Illinois law to create a triable issue of fact. *See Brazell*, 982 F.2d at 208; *L.S. Heath & Son, Inc.*, 9 F.3d at 572-

---

[5]Because the falsity of Marcotte and Murphy's statements related to Benda's commissions derive from the alleged falsity of the BUC Reports, there is also no genuine dispute whether Marcotte and Murphy knowingly made false statements about such commissions. The Court therefore grants summary judgment for Per-Se on Benda's fraudulent inducement claim related to any statements about Benda's commissions.

12

73. Accordingly, the Court grants summary judgment for Per-Se on Benda's fraudulent inducement claims based on statements related to the UMDNJ sale.[6]

### 3. Whether Benda Relied On Marcotte And Murphy's Statements

Per-Se contends that Benda cannot point to any evidence demonstrating that he relied on the misrepresentations regarding MedAxxis's capabilities in leaving Springfield and joining Per-Se. Per-Se argues that Benda could not have relied on these misstatements when leaving Springfield because a potential change of ownership at Springfield concerned him. While Benda stated that his concern over a potential sale of Springfield prompted him to begin looking for new employment, Benda did not testify that this concern is what ultimately caused him to leave Springfield. Although Benda admitted at his deposition that he would not now consider working for Springfield because it would be a "step backward," (R. 29-4; Ex. C at 75:10-76:23), this admission does not rule out the possibility that Benda relied on Marcotte and Murphy's misstatements about MedAxxis when he first left Springfield for Per-Se.

Rather, Benda submits his declaration stating that the "MedAxxis practice management system was considered critical to my decision to join Per-Se since it represented the 'front-end' system that would be marketed to the office-based physician market for which my sales group would be responsible." (R. 44-1; Benda Decl. at ¶ 19.) Benda further explains in his deposition that in deciding to leave Springfield and join Per-Se he relied on statements by Marcotte and Murphy regarding "the acceptability and functionality of the MedAxxis practice management system." (*Id.* at ¶ 22, 25-26.) These statements in Benda's declaration create triable issues of

---

[6]In addition, Benda also fails to make any argument that he relied on statements related to the UMDNJ sale in joining Per-Se. Accordingly, the Court also grants summary judgment on Benda's fraudulent inducement claim related to the UMDNJ sale on that basis.

13

fact whether Benda relied on Marcotte and Murphy's misstatements in leaving Springfield to join Per-Se.

### 4. Whether Benda's Reliance Was Justified

Per-Se asserts that Marcotte and Murphy's statements regarding MedAxxis's functionality were mere "puffery" and therefore Benda was not justified in relying on those statements. Per-Se relies on *Krieger v. Adler, Kaplan, & Begy*, No. 94 C 7809, 1997 WL 323827, at *4 (N.D. Ill. June 11, 1997), for the proposition that it is typically unreasonable to rely on statements made to a prospective employee during the recruiting process.[7] That case also noted, however, that "[i]n determining whether a statement is one of fact or opinion, the court looks to the surrounding facts and circumstances." *Id.* (citing *LaScola v. U.S. Sprint Comm.*, 946 F.2d 559, 568 (7th Cir. 1991)). As the Seventh Circuit explained in *LaScola*, the court must:

> focus on the circumstances surrounding the representation[s] to determine whether the plaintiff may have justifiably relied on the opinion as though it were a statement of fact. Among the relevant factors in such a case are the access of the parties to outside information and the relative sophistication of the parties.

*Lascola*, 946 F.2d at 568 (internal quotations omitted). Here, taking into account all of the facts and circumstances, genuine questions of fact exist whether Benda was justified in relying on the representations regarding MedAxxis. First, according to Benda, Murphy and Marcotte made their representations regarding MedAxxis in response to direct questions from Benda. (R. 44-1; Benda Decl. ¶¶ 18, 25.) Because Benda asked Marcotte and Murphy specific questions, it is likely that he expected the answers to be factual, rather than the "puffery" that may often occur during the recruitment of new employees. *LaScola*, 946 F.2d at 568. Second, Benda states that

---

[7]Per-Se also cites to the Court's decision in *Johnson v. Tellabs, Inc.*, 303 F.Supp.2d 941, 957-58 (N.D. Ill. 2004). *Tellabs*, however, was a securities fraud case dealing with statements made in a press release. The facts and circumstances surrounding the statements at issue in *Tellabs* therefore differ from the situation here, where the statements were made in response to a direct question during an interview.

14

because he was working at a competitor, Per-Se did not allow Benda to review the specifics of the MedAxxis software while he was considering joining Per-Se. (*Id.* ¶ 21.) Therefore, unlike the plaintiff in *Krieger* who had the opportunity to talk to his contacts about the potential employer's reputation, Benda had little access to information about MedAxxis other than Marcotte and Murphy's representations. Accordingly, genuine issues of fact exist whether Benda was justified in relying on Marcotte and Murphy's representations.

### 5. Whether Marcotte Or Murphy Intended to Induce Reliance

Fraudulent intent is a question of fact for the trier of fact to decide. *Edward M. Cohon & Assocs., Ltd. v. First Nat. Bank of Highland Park*, 249 Ill.App.3d 929, 938, 188 Ill.Dec. 106, 112 (Ill.App. 1993). Marcotte and Murphy made the representations regarding MedAxxis to Benda during Benda's interviews. (R. 44-1; Benda Decl. ¶¶ 18, 25.) Further, Marcotte and Murphy made the statements in response to questions asked by Benda. (*Id.*) The statements related to the functionality of MedAxxis, which Benda states was critical to his ability to sell to the office-based physician market. (*Id.* ¶ 19.) This evidence creates a triable issue of fact whether Marcotte and Murphy intended to induce Benda's reliance on their statements regarding MedAxxis's functionality.[8]

---

[8]In addition to the reasons set forth in Section II.B.2.b of this Analysis, the Court also grants summary judgment on Benda's fraudulent inducement theory based on statements about the BUC Reports because there is no issue of fact that Per-Se did not intend to induce Benda's reliance on those statements. Rather, Benda concedes that Marcotte encouraged the misrepresentation of information in the BUC Report in order to "make it look like the sales force had more activity than it actually did" and "to convince his superiors that he was doing a good job." (R. 34-1; Pl.'s Resp. Br. at 7; R. 29-4; Ex. C at 208:1-209:8.) Accordingly, even if Per-Se knew of the misrepresentations in the BUC Report, there is no issue of fact that Per-Se did not intend to induce Benda's reliance on the statements in the BUC Report.

## III. Benda's Tortious Interference Claim

### A. Whether Benda Timely Asserted His Tortious Interference Claim

In the Joint Initial Status Report, Benda plainly identified his allegations in Count 2 of his Complaint as a claim for wrongful termination: "Plaintiff asserts claims for fraud and wrongful termination under Illinois law against Defendants. Plaintiff alleges that he was induced into accepting employment with Per-Se and that he was wrongfully terminated from his employment."[9] (R. 17-1; Joint Initial Status Rep. §1(C).) Benda now attempts to recast his allegations of Count 2 as a claim for tortious interference with an economic advantage.[10] Absent leave of Court, however, Benda cannot bring new causes of action into this case. For that reason alone, summary judgment is proper on Count 2 of Benda's Complaint.

### B. Whether Questions Of Fact Exist Regarding Benda's Tortious Interference Claim

Benda attempts to identify two different theories of tortious interference with a prospective economic advantage. The first theory is that Benda had an expectancy of entering into a business relationship with UT-Houston and that Per-Se intentionally interfered by having operations take over the relationship for the sales department and by pushing the sale into 2004. The second theory is that Per-Se interfered by wrongfully terminating Benda on the eve of his stock option vesting. The Court addresses each of these theories in turn.

---

[9]This quote refers to "Defendants" because Marcotte and Murphy were originally defendants in this case along with Per-Se. The Court granted Marcotte and Murphy's motion to dismiss for lack of personal jurisdiction. (R. 19-1; Ct's June 16, 2004 Order.)

[10]Benda's Complaint does not specifically identify the cause of action asserted in Count 2. (R. 1-3; Compl.)

### 1. Interference With Benda's Relationship With UT-Houston

Benda devotes a mere five lines of his opposition brief to identifying his tortious interference theory related to the UT-Houston deal. Benda states:

> Benda had an expectancy of entering into a business relationship with UT Houston; Per-Se was clearly knowledgeable of the UT Houston deal; Per-Se intentionally interfered by ousting sales and having operations take over and by pushing the sale in the Q1 2004.
>
> These events coupled with Benda's abrupt termination, prevented Benda from receiving his commissions and he was denied commissions of approximately $130,000.00.

(R. 37-1; Benda Opp. Br. at 12.) Benda does not cite to any evidence of record in support of this theory. Accordingly, Benda has waived this argument by not adequately developing it. *See Huck Store Fixture Co. v. N.L.R.B.*, 327 F.3d 528, 537 (7th Cir. 2003) (a party waives an undeveloped argument).

Even absent this waiver, Benda's theory of tortious interference still fails. Under Illinois law, to prove tortious interference with a prospective economic advantage, a plaintiff must prove that the defendant acted with intent to deprive the plaintiff of such advantage. *Ty, Inc. v. MJC-A World of Quality, Inc.*, No. 93 C 3478, 1994 WL 36880, at *4 (N.D. Ill. Feb. 8, 1994); *Hayes & Griffith, Inc. v. GE Capital Corp.*, No. 88 C 10179, 1989 WL 135246, at *9 (N.D.Ill. Oct. 24, 1989) ("A plaintiff alleging such a cause of action must allege facts that indicate that the defendants acted with the purpose of injuring plaintiff's expectancies.") (internal quotations omitted). Here, Benda does not point to any evidence that Per-Se altered the UT-Houston deal or negotiations in order to deprive Benda of his expected commissions. Accordingly, no genuine issue of fact exists that Per-Se did not intentionally interfere with any expectation Benda had from the UT-Houston deal.

### 2. Interference With Benda's Stock Options

Benda also appears to argue that Per-Se tortiously interfered with him receiving stock options by terminating his employment on the eve of his stock options vesting. As Per-Se explains, however, under Illinois law, a plaintiff can only maintain a tortious-interference claim against a thirty party to the prospective business relationship at issue. *See Douglas Theater Corp. v. Chicago Title & Trust Co.*, 288 Ill.App.3d 880, 887, 681 N.E.2d 564, 569 (Ill.App. 1997). Therefore, an employee cannot claim tortious interference with prospective economic advantage against his or her own employer based on the termination of the employment relationship. *See Cooper v. Durham Sch. Servs.*, No. 03 C 2431, 2003 WL 22232833, at *9 (N.D.Ill. Sept. 22, 2003) ("the alleged prospective business relationship must be with a third party, not with the defendant, because a party cannot be liable for interfering with its own business relationship.") Accordingly, the Court grants summary judgment on Benda's tortious interference claim.

### IV. Benda's Procured-Doctrine Claim

Per-Se argues in its Reply Brief that Benda asserts a procured-doctrine claim for the first time in its Opposition Brief. The Court does not read Benda's procured-doctrine argument to be a separate claim. Rather, Benda appears to argue that the procured-doctrine establishes Benda's business expectancy of sales commissions underlying his tortious interference claim. Per-Se is correct that to the extent Benda is attempting to assert a new cause of action against Per-Se, that Benda cannot add claims to this case absent leave of Court. Therefore, to the extent Benda treats its procured-doctrine argument as a separate cause of action, the Court grants summary judgment for Per-Se on that claim.[11]

---

[11]The Court does not need to reach Per-Se's other arguments related to the deficiency of Benda's procured-doctrine claim.

## CONCLUSION

The Court denies Per-Se's motion for summary judgment on Benda's fraudulent inducement claim based on alleged statements about the capabilities of the MedAxxis product. The Court grants Per-Se's motion for summary judgment on Benda's fraudulent inducment claim based on any other alleged statements and also on Benda's tortious interference with a prospective economic advantage claim.

Dated: June 2, 2005

ENTERED:

*[signature]*

AMY J. ST. EVE
United States District Court Judge